No. 10,212.

T. A. MITCHELL VS. THE NEW ORLEANS AND NORTHEASTERN RAIL-

ROAD COMPANY.

1. A demand for compensation, for land which has been taken by a railway corporation for a road-bed, and upon which their railroad has been constructed and put in operation, other-wise than by legal expropriation proceedings, is not prescribed by two years, under Sections 689 and 1497 of the Revised Statutes. R. C. C., 2630, and Section 5 of Act 125 of 1880, page 169.

They apply only in cases of expropriation.

2. Such a demand is not one for damages *ex delicto*, for a tort, or wrongful entry upon the *lands* of *the claimant ;* it is in the nature of a personal action for the value of land the *fee* to which has passed to the corporation by a *quasi* alienation.

3. In case such a corporation shall make an unlawful entry upon the land of another person, for the purpose of constructing thereon a road-bed for its track, it is the duty of such person, at once and peremptorily, to forbid such unlawful entry, and to undertake the nec-essary *legal* means to prevent it.

If, on the contrary, he fail to invoke the arm of the law and at a time when it would have been of avail to him, and acquiesces in such entry and permit the corporation to construct the road thereon, without resorting to expropriation proceedings, he cannot afterwards require its demolition, or prevent its use.

# APPEAL from the Civil District Court for the Parish of Orleans. Monroe, J.

*E. Howard McCaleb* for Plaintiff and Appellee:

1. Prescription cannot be set up against a continuous damage.  2 Addison on Torts, 1163; Wood's Law of Nuisance, Sec. 772; 35 Ann. 952; 97 U. S. 668.
2. Maintenance of an embankment which floods the land of an adjacent proprietor is a *nuisance.* Wood's Law of Nuisance, Sec. 358.

The proprietor below is not at liberty to raise any dam to prevent the running of water.  R. C. C. Arts. 661 and 664.  Such servitude can only be acquired by title, or by a possession of ten years.  R. C. C. Art. 765.

3. A claim for the value of land appropriated and used by a railroad company for its right of way, is not prescribed by two years, under Art. 2630, R. C. C., because it is not a demand for the land itself, or for damages caused by its expropriation.  35 Ann. 924; 39 Ann. 431, 1063; Constitution 1879, Arts. 155 and 156.
4. In an action for injury to real property caused by flooding, the measure of damages is the difference between the market value of the land immediately before and immediately after the injury is complete.  Shearman & Redfield, Sec. 602; 4 Watts & Serg. 362; 24 Barb. 273; 96 U. S. 407.
5. A railroad company must so build its road-bed as not to needlessly injure the land over which it passes.  It cannot obstruct drainage with impunity, and is responsible in damages to the adjacent proprietor for flooding his land.  35 Ann. 947, 1045; 37 Ann. 728; 38 Ann. 164.
6. A court has the right to order obstructions to the natural drainage of land removed.  7 Ann. 44.  A party cannot be considered as acquiescing in the construction and maintenance of an embankment on his land by a railroad company where he (1) objected in advance; (2) refused to give title for right of way, and (3) where defendant company, ignoring the provisions of its own charter, entered, without acquiring title by sale, by donation, by expropriation proceedings, or by prescription.  Kerr's Injunctions in Equity, *19.
7. Bayous are water courses (Wood's Law of Nuisance, Sec. 338); and by its charter defendant was required to so construct its road-bed as not to impair their usefulness, and to erect bridges, not embankments, across them.  Sec. 2, Act No. 106, approved October 25, 1871; Acts 1872, pages 8 *et seq.*
8. There can be no set off of benefits against actual injury resulting from the erection and continuance of an embankment, by which the lands of the adjacent proprietor are flooded.  Wood's Law of Nuisance, Sec. 359.
9. The error of a trial judge in coercing a *remittitur* of a portion of a verdict, under threat of granting a new trial, may be reviewed on appeal.  95 U. S. 694; 18 Fed. R. 331; 15 Fed. R. 490.  Especially, if the demand itself be not reduced.  A trial judge has no right to substitute his opinion for the verdict of a jury as to the *quantum* of damages.  1 Mason 177.

*Robert Moll* and *Harry H. Hall* for Defendant and Appellant:

1. The prescription of one year applies to injury caused by the construction of a railroad embankment.  V. C. C. 3535 (3601); 22 Ann. 616; 16 Ann. 338; 21 Ann. 492; 20 Ann. 214; 16 Ann. 140; 25 Ann. 414.

Mitchell vs. Railroad Company.

Prescription begins to run from the day when the damage was sustained, and not from the day when the act complained of was committed. V. 16 Ann. 354; 3 Ann. 529; 22 Ann. 616; 37 Ann. 728.

2. All claims for land or damages to owner growing out of the expropriation thereof for public or quasi public works are prescribed by two years. C. C. 2630; Revised Statutes, 698, 1479; Acts of 1880, p. 169; 31 Ann. 478; 35 Ann. 949. Manning's Unreported Cases, 231.

3. "A remission in the court below of the amount of damages allowed by the jury, will stop the party from setting up any claim for damages in the Appellate Court." Kemp vs. Womack, 1 Rob. 367; V. Leonard vs. Kleinpeter, 7 Ann. p. 44.

4. "If a party having a right, stands by and sees another building on the property in a manner inconsistent with that right, and makes no objection while the act is in progress, he cannot afterwards complain. That is the proper sense of the word 'acquiescence,' Redfield, Railways, vol. 2, p. 390; St. Julien's case, 35 Ann. 924; 18 Ohio 169; Pierce on Railroads, 169, 230; Well's Eminent Domain, Sec. 140; 35 Ann. 947; Bourdier vs. Belleisen; Day vs. R. R. 36 Ann. 246.

"If a land owner, knowing that a railroad company has entered upon his land and is engaged in constructing its road without having complied with the statute, remains inactive and permits them to go on and expend large sums in the work, he will be stopped from maintaining either trespass or ejectment for the entry, and will be recorded as having acquiesced therein." Wood's Railway Law, vol. 2, page 792; Wood's Railway Law, vol. 2, page 786."

"It is also true that under the Constitution and laws of this State the assessment of damages and payment or deposit of the amount is a condition precedent to the vesting of the title, or of any right in the company to construct their road. But these conditions are susceptible of being waived, and in these great public works the shortest period of clear acquiescence, so as fairly to lead the company to infer that the party intends to waive his claim for prepayment, will be held to preclude the right to assert the claim in any such form as to stop the company in the progress of the work, and especially to stop the running of the road after it has been put in operation, whereby the public acquire important interests in its continuance, Whatever rights the plaintiff may have against the present plaintiff in error, growing out of this right of way question, and whether he is estopped *in pais* to assert any or all of them, it seems clear to me that he is not entitled to a judgment that would enable him to sever a line of commerce which, by his assent, if not through his active agency in part, was constructed over the same property, and has enjoyed free passage over it for at least seven years." Wood's Railroad Law, 2, page 785; 33d Vt. 311.

"To entitle one to relief, by injunction, against the construction of a railroad over his land, he must use due diligence in the assertion of his rights since the relief will not be granted in favor of one who has been guilty of great laches, and who has, by his own conduct, given an implied assent to the construction of the work which he afterwards seeks to restrain. Thus, where the owner of land has silently stood by and neglected to assert his rights, and has permitted a railway company to enter upon his land, and to proceed with the erection of its works for a considerable length of time, without interruption or complaint, he is estopped from the aid of equity for the prevention of the work." High on Injunctions, vol. 1, par. 618.

"The owner of the lands who allows a railroad company to occupy and use the same for the construction of its road, and other appurtenances necessary to the operation of the railroad, without remonstrance or complaint, will be held to have acquiesced therein, and such acquiescence would bar his action to dispossess the company." 39 Ann. 457. See also St. Julien's case, 35 Ann. p. 926; Belleisen, 35 Ann. p. 947; 31 Ann. p. 478; 39 Ann. p. 427.

5.  " An interference with the flow of surface water, caused by a public improvement
    authorized by law, is a consequential injury. If a railroad or public road, made with
    reasonable care and skill, incidentally injures adjoining land, by obstructing the flow of
    surface water, there can be no recovery for such injury." Mills on Eminent Domain, par.
    189; 60th Mo. 329, 334; 23d N. Y. 42; 74 N. C. 220; 66th N. Y. 62; Pacif. Rep. Dig. 1-10,
    p. 670.

I.

The opinion of the Court was delivered by

WATKINS, J.    Plaintiff is the owner of 950 acres of land situated on
Honey Island, between East and West Pearl rivers, in Louisiana, on
which he resides, and of about 170 acres on the east bank of East Pearl
river, opposite the former, in the State of Mississippi.  He is a farmer,
and engaged in stock raising.  He alleges that these lands were worth
$50 per acre in 1882.  That during that year, the defendant company
commenced and constructed their railway through a portion of said
Louisiana tract of land, that is to say, the south half of section thirty-
eight of township seven, of range fifteen, containing 320 acres, and ex-
tending diagonally through it from the southwest to the northeast
corner, on the west bank of East Pearl river—thus leaving, of the
whole, three hundred and twenty acres south and west of the road, and
six hundred and thirty north and east of it.

Petitioner avers that defendant company entered upon the lands with-
out his consent and against his protest, and threw up an embankment
from seven to twelve feet high, and occupied for their right of way a
width of one and one-half acres of his land, for a distance of twenty-
two acres, making an aggregate of thirty-three acres in quantity, and of
the value of $1650, and has since used, and now uses and occupies the
same.

He further avers that the defendant's embankment extends across
Honey Island, from East to West Pearl rivers, a distance of six miles,
and that it has impeded and destroyed the natural flow, and escape of
the flood-waters which frequently come down Pearl river, as well as the
surface waters in time of rains; that it has stopped up the natural
drains existing thereon, known as Roan's bayou, and Bridge bayou, and
thereby destroying the drainage into and through the same; that this
impediment has caused his lands to overflow and their value destroyed
for agricultural purposes, and as a suitable pasture for hogs and cattle,
and rendering his avocation hazardous and attended with great loss of
cattle, etc.

He alleges that these lands were very fertile and produced large crops
of corn, sugar cane, rice, peas, and potatoes; about one hundred and fifty
acres were arable, and three hundred and fifty more were under fence;

all of said lands (other than the lands just described) were cane bottom timber lands, specially adapted for grazing cattle, and as a range for hogs; and, being more elevated than those adjacent, they afforded a "safe refuge for cattle and hogs in time of high water, and freshets."

The petitioner then particularizes and specifies the various different items of damage he has sustained, in consequence of the construction and maintenance of said embankment, and which aggregate $11,850, in addition to the value of the right of way, specified above.

The defendant first tendered a plea of prescription, and, it having been passed upon, it filed an answer declaring that it had constructed an usual and customary road-bed across Honey Island, under the law, of only sufficient size and height to be above, and withstand the floods which frequently cover said land. That it crosses said land in such way as to offer the least possible resistance to overflow, or other water, and at a cost of maney thousands of dollars more than the value of the land. That the plaintiff knew of the construction of said embankment, which was many months in course of construction, and did not take any legal action to prevent it. It denies that any of plaintiff's alleged complaints were ever made to any person duly authorized to represent the company, and that "same should have been made to the president, or other legal representative of the corporation, and not to a subordinate; and if there was a difference of opinion as to the effect of the public work about to be constructed * * upon the drainage or water-flow * * he should have provoked and obtained a legal interpretation of his rights, in time to *prevent* the construction of the work complained of."

It avers that the bayous which are alleged to be closed up are not bayous or running streams, but mere gulleys, and not natural drains, in any sense of the word. That Honey Island is a very low tract of land, which has been subject to annual inundations, "ever since the memory of man." That people who own and graze cattle on this island, remove them, every season of overflow, to the high land east of Pearl river, as a place of safety.

That persons who plant crops of any kind on that land take the chances of having them destroyed, and that such has always been the case since the island was first settled. That the overflow upon said land is equal and uniform, submerging it above and below its road, which adds nothing to its height, or to the force of the water's current, and that it remains upon the land only for a short while at a time, passing off when the river runs down.

Defendant avers that, instead of plaintiff's lands being worth fifty *dollars* per acre, same are not now, and never have been, worth

more than fifty *cents* per acre; and denies that there is now, or ever has been any valuable pasture on plaintiff's land, or that the company ever promised him anything for the insignificant strip that was necessarily appropriated for a road-bed.

The case was submitted, in the court below, without argument, and the jury rendered a verdict of $7500 for the plaintiff, and found that the embankment complained of, constitutes a continuing obstruction to the natural drainage of plaintiff's land, and that the defendant ought to be condemned to reopen such natural drainage, by the removal of said embankment, or otherwise.

The defendant made a motion for a new trial, and, when it came to be heard, the judge *a quo* signified that the verdict, in his opinion, was excessive, and plaintiff's counsel entered a *remittitur* of the amount of the verdict in excess of $1000, for which sum the judgment was signed, and therefrom the defendant appeals.

Counsel for plaintiff contends that this was a case of a *remittitur* entered under judicial compulsion, which does not estop him from having it set aside, and recovering the full amount of the verdict. But, in consideration of the views we entertain of the merits of this controversy, it is unnecessary for us to discuss this interesting question.

## II.

As a satisfactory classification of the demands of the plaintiff, as represented by the verdict of the jury, we will collate them from his counsel's brief. They are as follows, viz:

1.   Oat crop destroyed in the spring of 1886.
2.   One horse and one mule drowned in 1886.
3.   Value of right of way over forty-three and one-third acres of land.
4.   Loss of rent of fifty acres of cleared land for the year 1886.
5.   Injury to 900 acres of land by washing.
6.   Four hundred acres denuded of vegetables by the overflow of 1886.
7.   Destruction and deprivation of pasturage for 1000 head of cattle, during the overflow of 1886.

All of these items aggregating $9541 in amount.

Before commenting on the evidence appertaining to the merits, we will consider the defendant's plea of prescription of one and two years.

## III.

On the trial of the plea of prescription, the judge *a quo* maintained it as to the claim for cattle lost, and deprivation of land, during the years 1882, 1883, 1884 and 1885, this suit having been filed on the 15th of

February, 1887. To this part of his ruling, plaintiff's counsel urges no complaint in his brief. The judge further ruled that the defendant's right must be reserved in respect to said plea against the claim for damages sustained by the loss of a horse and a mule in the early part of 1886, "until it is made to appear from the evidence at what date, or dates said animals were lost."

The judge, further ruling, maintained the plea " with respect to such damages to, and deprivation in the value of the land, as may have occurred, or resulted prior to February 16th, 1887."

It should read 1886, as the court had under consideration the damages alleged to have been " sustained more than one year before the service of citation in this suit, February 16th, 1887."

Consequently. it will be seen that the items claimed in the specifications do not, on the *face* of plaintiff's petition, fall within the period mentioned, and how the same may be affected by the evidence we shall see in the progress of the discussion.

The judge's ruling, as we understand it, does not affect plaintiff's claim for *compensatory damages* for the value of defendant's right of way. Nor do we think the two years' prescription pleaded, applicable to this demand. Sections 698 and 1479 of the Revised Statutes, do not apply, because the defendant did not comply with their provisions and cause the plaintiff's property to be judicially expropriated. R. C. C. 2630.

These different provisions of law are substantially the same, and are to the effect that whenever a railroad corporation "cannot agree with the owner of any land which may be wanted, for its purchase, it shall be lawful for such corporation to apply by petition to the judge * * describing the lands necessary for their purposes, with a plan of the same, and a statement of the improvement thereon, if any, and the name of the owner thereof, if known and present in the State, with a prayer that the land be adjudged to such corporation, upon the payment to the owner of all such damages as he may sustain in consequence of the *expropriation* of his land as a public work. All claims for land, or damages to the owner, caused by its *expropriation* for the construction of any public work, shall be barred by two years' prescription, which shall commence to run from the date at which the land was actually occupied and used for the occupation of the works."

Sec. 5, Act 125 of 1880, p. 169, is to the same effect.

This evidently means the occupancy by the corporation of the owner's property under the judge's order of adjudication. There is a wide distinction between the occupancy of a corporation under a decree of ex-

propriation, and an occupancy without the authority of the judge, or even the sanction of the owner, as is alleged in this case.

*Jefferson and Lake Pontchartrain Railroad Company* vs. The *City of New Orleans*, 31 Ann. 479, cited by the defendant's counsel, rests upon the provision of a special statute, exceptional in character.

## ACT 165 OF 1858.

Under the fourth section of that act a board of commissioners was invested with full power to drain certain districts of the City of New Orleans, and to that end it had the right "at all times, of *entering on the lands*  *   *  and of placing therein their engines and machinery *   *  and of *digging all necessary canals and drains, making all necessary embankments and levees*, etc." The only right the owner had reserved him, was that of making opposition in the courts. In that case the court held that the *title* did not pass to the commissioners, "but only a right of servitude of drain" was created. The compensation claimed in that case was for damages sustained by a "*forcible, wrongful* and *illegal* entry" upon plaintiff's land. In this it is for the value of the land, the *fee* in which has passed to the railroad company.

We are of the opinion that this plea is not good.

But the damages alleged to have been sustained to plaintiff's land, by washing, are governed by an entirely different rule, and to this claim the plea urged is good, and the demand was, by the judge *a quo*, properly restricted to such damages as were sustained within one year prior to suit.

Plaintiff's theory in reference to a *continuing* obstruction to the natural drainage of his land, and same giving rise to a continuing damage, which is, in some manner, imprescriptible, we do not think well founded in law. We can well understand the principle, that, in case of a continuing nuisance, resulting injuriously, one recovery does not exhaust the right of action, nor preclude another, or many, subsequent recoveries, so long as it remains unabated; but we are of the opinion that it cannot be, with propriety, extended so far as to suspend prescription in case no action is instituted, at all, If plaintiff has permitted the obstruction, and consequent damage, to continue, on the very premises he has occupied, and attempted to use, during all of those years since 1882, without suit, or judicial restraint of any kind, we are decidedly of the opinion that the plea of one year's prescription is applicable, and, though a harsh remedy, must be applied.

## IV.

It is well to observe, at the outset of a discussion of the facts of this

case, as applicable to the merits, that, on account of the large number of witnesses who were examined by the parties respectively, under commission and in open court, and the great latitude allowed in their examination, the issues have been of very unsatisfactory analysis; and, on that account, we find it practically impossible to give the testimony in detail, or by way of an intelligent summary. Nor, in our view, would even a concise digest of it, subserve any useful purpose, but on the contrary, would unnecessarily encumber our opinion.

We find in evidence a report made by the Chief of Engineers to the Secretary of War, in 1879, in which is given an accurate idea of the topography of Honey Island, as evidenced by actual surveys. This report was made during the period of plaintiff's occupancy, and immediately previous to the construction of the embankment in question, by the railroad company.

This report states that the general, or mien course of Pearl river, from Jackson, Mississippi, to the Gulf of Mexico, is due south, and that the distance between those points is about 290 miles. The head of West Pearl river is at the end of the 265th mile from Jackson, near Wakiah Bluff, at which point the valley is several miles wide, "and it is all low cypress brakes and bayous, and old river channels, bordered with high cane and thick woods in narrow belts. The height of the flood of 1874, was here 26 feet above low water. * * At the end of the 277th mile from Jackson, old Pearl river makes an abrupt turn to the northeast, and it is at this point that Home Bayou leaves to the right. It has a mean depth of ten feet, and is full of sharp, short bends. * * A mile below its head Little Home Bayou leaves to the northward, but it is joined by several bayous from the west swamps, and where it again returns at the 280th mile, it has fully twice as much water as it had when it left. Below its entrance into Home Bayou there is an immediate increase of five feet in depth on the low shoal places, and a width of not less than 100 feet. * * At the end of the 282nd mile West Pearl river again enters with nearly all the water of the valley. * * * *The left bank of Home Bayou is called Honey Island*, and it retains the name down to East Pearl river entrance, near its mouth.

"Honey Island was once inhabited, and very *many farms were, for a long time, cultivated on it; but owing to the height of the floods it has been nearly abandoned.*" P. 897.

This quotation is made from the sketch and field notes furnished by the assistant engineer, and embraced in the report. But in his report the chief says:

"Perhaps no stream in the country has had its character so entirely

changed within the past fifty years than has this. Not later than fifty years ago it was known as an excellent, navigable, clear-water stream. * * The stream is now as muddy as the Mississippi river; its length has been shortened fully one-tenth by cut-offs, and its banks, in nearly every bend, are annually caving in, with their load of trees to form obstructions to navigation. *As natural sequences planters have been driven, by floods, from the bottom lands,* which they denuded of their protecting forests and undergrowth, and the commercial business of the valley has been entirely destroyed." P. 899.

There are several witnesses—some for the plaintiff and some for the defendant—who confirm this statement from the engineer's report. They assert, from actual personal knowledge, that Honey Island has, for a great many years, been subject to extensive overflows, at intervals of several years, and to lesser ones every year, and ranging in depth, from one to ten feet. That there are but few people living on the island, and it is regarded as a free pasture for cattle and range for stock. That milch cows frequently swim Pearl river twice a day going to, and returning from the island. That when the water floods the banks of Pearl river "it covers everything," That the owners of cattle drive, or swim them out during times of high water, as they could not live on the island. That the people who reside on the island are those of small means and who cultivate very small patches of a few acres each.

The plaintiff's lands are rather more elevated than others on the island, and some of them produce cereals very abundantly. There is some evidence to the effect that the rental value of some of his lands have been diminished considerably since the construction of the embankment, but they do not attribute same *wholly* to that cause; while others deny it. It is shown that the lands situated on East Pearl river, at that point, are six or eight feet higher than those on West Pearl river —eight or ten miles distant—and that the natural inclination of the ground is in that direction.

As it is a conceded fact that defendant's road-bed and embankment extend diagonally through plaintiff's land from southwest to northeast— and plaintiff's land is, at the point of its intersection, only three-fourths of one mile in width, and *situated on the west bank of East Pearl river* where the lands are of the greatest altitude—it stands to reason and philosophy that the embankment, while it operates as a temporary restraint to the overflow and surface water descending, would at the same time, serve to increase their flow towards West Pearl river, and soon relieve the land; while, to the lands below, it would be an additional protection against both.

Taking the testimony, all in all, we are of the opinion that five hundred dollars would be a liberal allowance to the plaintiff for *all the damages* he has suffered from the causes assigned.

## V.

The defendant's witnesses state that the railroad company's road-bed and right of way occupy about forty acres of plaintiff's land—which is more than is demanded in plaintiff's petition—and may be accepted as about the correct allowance to be made in quantity; but, from all the testimony, we think plaintiff's estimate of fifty dollars per acre—situated as these lands are, and as they are undoubtedly circumstanced—is an extravagant extimate. It is submitted that five dollars per acre is a fair and adequate compensation for them, or two hundred dollars for the whole.

## VI.

There remains but one other question for solution, and that is the claim in the verdict and judgment which condemns the defendant to "reopen such natural drainage by the removal of said embankment, or otherwise."

It would certainly be unjust to the railroad company to compel it to remove the superstructure and demolish its embankment throughout the *entire* distance from East to West Pearl river and erect, in its stead, an expensive trestle, merely for the relief of plaintiff's six hundred and eighty acres of land, situated above. Surely the defendant's act, in openly entering upon the defendant's land, with plaintiff's knowledge, and in full view of his domicile, and constructing thereon a most important link in their transcontinental railway, could not subject it to such consequences. But this is not an open question, however, as it has been by us twice considered and decided adversely to plaintiff's contention, and in cases cited in plaintiff's brief.

In Bourdier & Bellescin vs. Railroad Company, 35 Ann. 949, it was said:

"If the entry was unlawful, the plaintiffs condoned it. They should, at once, and peremptorily have forbidden the entry of the defendant, if they intended to *dispute its right to the road-bed*, etc.   *   *   They should have denied defendant access, *and have prevented it by using legal process.*"

In St. Julien vs. Morgan's Railroad Company, same volume, at page 925, this court again said, in even more concise and unequivocal terms, upon the same subject:

"It is unnecessary for us to say or to intimate how, or whether

he would have been protected had he done more than *talk to a lawyer.* Certain it is he did not invoke the arm of the law, at a time when it would have been of service to him, but, on the contrary, acquiesced in the defendant's taking possession and using his property, encouraged it to prosecute its work by abstaining from any attempt to prevent it, and made no complaint *in a court of law,* of the injuries inflicted upon him, until the defendant had expended large sums of money in completing it. Having thus permitted the use and occupancy of his land, and the construction of a *quasi* public work thereon, without resistance, or even complaint, *he cannot afterwards require its demolition, or prevent its use,* etc."

(The italics are ours.)

It is submitted that the plaintiff has acquiesced in the construction of the embankment on his land by the defendant company. It was erected in 1882, and this suit was not filed until 1887.

He certainly did not attempt, by a due and timely resort to judicial proceedings, to *prevent* its construction. As we understand it, plaintiff's complaint is that the defendant constructed an embankment and not a trestle, and that it has failed to make compensation for the injury his property has thereby received — there having been a disagreement between himself and the officers of the corporation, as to the amount due.

Our predecessors maintained this principle in Jefferson and Lake Pontchartrain Railroad Company vs. City of New Orleans, 31 Ann. 481, cited *supra,* and in which is quoted an extract from Goodwin vs. Cincinnati, 18 Ohio 169, and from which we select the following paragraph, viz :

" Where a party stands by    *    *    and silently sees a public railroad constructed upon his land, it is too late for him, after the road is completed    *    *    to seek by injunction, or otherwise, to deny the railroad company the right to use the property. Considerations of public policy, as well as recognized principles of justice between parties, require that we should hold, in such cases, that the property of the owner cannot de reclaimed, and there *only* remains to him a right of compensation. An injunction    *    *    *might have been sought at the first known attempt or even threat to despoil* the land, or to construct the railway upon its line. '*The omission to do so is an implied assent.* The work being *completed, the public,* as well as those directly interested in the road    *    *    have a right to insist on the application of this rule." *Vide* Tilton vs. Railroad Campany, 35 Ann. 1002 ; Lawrence vs. Morgan's L. and T. R. R. and S. Co., 39 Ann. 427.

## VII.

We think the defendant did not violate the terms of its charter requiring it to "maintain its railroad over and across *waters* of the State of Louisiana known as Lake Pontchartrain and *other streams and bayous* between Lewisburg and Pearl river by *bridges*."

The proof does not show, to our satisfaction, that the depressions existing in 1882, in and through some portions of plaintiff's lands, were, in the sense of that provision of defendant's charter, either *bayous*, *waters*, or water-courses. Evidently they were such as had been made, from time to time during years previous, by the attrition of overflow water from East Pearl river and surface-water produced by the fall of rain.

These are inherent to any soil which is left in a state of nature, and unprotected by levees or embankments. We do not regard them as of the character of streams which the railroad company was obliged to bridge, or span with culverts.

Entertaining these views, the judgment appealed from is excessive to the extent of three hundred dollars; and that part of the decree which requires the demolition of the embankment complained of, is reversed, and set aside.

It is, therefore, ordered and decreed that the judgment appealed from be amended in the following particulars, viz:

1. So as to reduce the amount thereof from one thousand to seven hundred.

2. So as to relieve the defendant company from demolishing, or altering its embankment and road-bed.

And that, as thus amended, same be affirmed with the cost of appeal taxed against plaintiff and appellee.