[S. F. No. 6061.   In Bank.—February 19, 1915.]

# MILLER & LUX INCORPORATED and THE SAN JOAQUIN AND KINGS RIVER CANAL AND IRRIGATION COMPANY INCORPORATED, Appellants. v. ENTERPRISE CANAL AND LAND COMPANY, J. G. JAMES COMPANY, JAMES CANAL COMPANY, et al., Respondents.

Appeal from Judgment—Direction by Supreme Court for Entry of Judgment — Effect of Order Granting New Trial Pending Appeal.—Where one of several plaintiffs appeals from a judgment against it, and pending such appeal the defendants move for a new trial on the ground, among others, that the evidence is insufficient to support the decision, an order granting the motion which is affirmed on appeal, has the effect to set the entire case at large, and gives the lower court authority to try the whole case anew, even though the supreme court has, on the first appeal, remanded the cause with directions to enter a certain judgment in favor of the plaintiff appealing, and the entry of such judgment, in pursuance of the mandate of the supreme court, is made subsequent in point of time to the order granting the new trial.

Water and Water-rights—Lands Riparian to Fresno Slough and Riparian to San Joaquin River.—By reason of the exceptional hydrographical and geographical situation, which makes the waters of Fresno Slough during the times of their ordinary flow remain stationary or rise and fall precisely as do the waters of the San Joaquin River, the waters of the slough being absolutely governed and controlled thereby, lands riparian to Fresno Slough are also riparian to the San Joaquin River.

Id.—Riparian Rights—Prescriptive Title—Diversion Below Riparian Land.—Under the established law of riparian rights, a title by prescription cannot be acquired against a tract of riparian land by diverting the water from the stream at a point below such land, and not interfering with the stream at the riparian land.

Id.—Application of Doctrine of Implied Dedication—Owner must have Right of Action.—Such doctrine is only applicable in cases where the public use involved an interference with the property rights of a private owner, sufficient to give such owner an immediate right of action to abate or prevent the same.

Id.—Controversy Affecting Rights of Riparian Owners—Physical Laws Affecting Flow of Water—Judicial Notice.—In a controversy between upper and lower proprietors to determine their right to take, through their respective canals, the waters of a stream, evidence need not be produced to prove a fact dependent upon the law of physics that water seeks its own level, since this is a proposition

of which judicial notice may be taken; and such rule applies where it is shown that the flow resulting from the taking of water by either of the proprietors necessarily affects and tends to lower the level of the stream at a place where the other proprietor takes the water.

ID.—SAN JOAQUIN RIVER—FRESNO SLOUGH—CANAL SITUATED BELOW JUNCTION OF RIVER AND SLOUGH—FINDING AS TO EFFECT OF WATER TAKEN IN CANAL.—In this action, involving the rights of the plaintiffs to take the waters of the San Joaquin River through their canal at a place just below the junction of the river with Fresno Slough, as against the defendants claiming a priority of right as upper riparian proprietors on Fresno Slough and consequently as such proprietors on the San Joaquin River, the evidence, showing the hydrographical and geographical situation of the defendants' lands, and the mechanical means used by the plaintiffs to impound the water taken by them, is held not to support the findings that the natural flow of the water from the river into the slough is not and never had been impeded by the operation of the plaintiffs' canal, or that the taking of water out of the slough by the defendants for use on their lands would not damage the plaintiff.

ID.—IMPLIED DEDICATION OF RIPARIAN RIGHTS TO PUBLIC USE—ACQUIESCENCE OF RIPARIAN PROPRIETOR FOR MANY YEARS.—Where a canal company, which devotes its waters to public use, had constructed and maintained, as part of its water system, a dam across a natural stream, in such manner as to back up the natural flow of the stream and form a reservoir in which to collect water for distribution, a part of which reservoir is on land of an upper riparian proprietor, and the latter, having full notice, acquiesced without objection for a period of twenty-five years in such conditions, such conduct on the part of the upper proprietor is equivalent to a dedication by him of his riparian rights to the public use served by the canal company, and he cannot thereafter interrupt nor prevent the same, his only remedies being to seek compensation for the property he has thus allowed to be taken, or an injunction conditioned merely on the failure to make good the damages resulting from the taking.

ID.—RIPARIAN RIGHTS LOST BY DEDICATION CANNOT BE REGAINED BY DIVERSION AT ANOTHER PLACE.—Such upper proprietor, having thus lost the riparian rights pertaining to his land, neither he nor his successor can be allowed to regain those rights by the expedient of going up the stream and there diverting the water to the same riparian land.

ID.—DIVERSION BY UPPER APPROPRIATOR AS AGAINST PRIOR LOWER APPROPRIATOR.—The diversion of water from an upper part of a stream, by one claiming as a mere appropriator, is unlawful as against a prior appropriation below, so far as it is injurious thereto.

ID.—WATERS OF CANAL COMPANY DEVOTED TO PUBLIC USE—EVIDENCE ESTABLISHING.—The plaintiff canal company must be deemed to

devote its waters to public use, where it was stipulated that for five years immediately preceding the commencement of the action it had continuously diverted into its canal and appropriated the water in controversy, and that "all of such water during all of that time, was sold, rented, supplied and distributed to others, for purposes of irrigation, the watering of stock and domestic and other beneficial purposes, and that beneficial use was made of said water so appropriated and all thereof," and the court found and the evidence showed, that many thousands of acres of land, occupied by a large number of persons as owners or tenants, were irrigated with water from the canal, that they had thereon many thousands of acres of growing crops of grain, fruit, and other crops, and that a number of villages had grown up along the canal, the inhabitants of which receive water therefrom for their lands and for domestic use. The fact that the company disposes of part of its water to a particular customer on more favorable terms than to others does not convert the use into a private use.

Id.—Right of Irrigation—Rights of Riparian Proprietor.—The right of irrigation is a part of the riparian owner's rights in the use of the water of a stream; but his title to the water begins only when it reaches his land and lasts only so long as it is flowing past his land. Until it reaches his land, he has no title whatsoever and no right other than the protective right to see that the full flow past his land to which he is entitled is not legally diminished.

Id.—Diversion by Lower Riparian Proprietor at Point on Stream Above His Land—Consent of Intervening Proprietor Necessary.—A lower riparian proprietor may not, without the consent of intervening riparian proprietors, go above them on the stream and take water therefrom at such point for use in irrigating his lower riparian lands.

Id.—Effect of Diversion on Upper Proprietor.—As to an upper riparian proprietor, the *effect* of a diversion above him is the same whether the diversion is but a mere appropriation or whether it is made to place and use the water upon lower riparian lands.

Id.—Extent of Flow to Which Riparian Proprietor is Entitled—Remedy for Interference With Right.—A riparian proprietor is entitled to the full flow of the stream, reduced only by the proper riparian uses which may be made of the water by proprietors above him; and he may restrain an unauthorized taking above his lands by a lower riparian proprietor for irrigating his lower riparian lands without showing any damage, upon the broad doctrine of riparian rights that the taking itself is an interference with his freehold which he is entitled to restrain lest it ripen into a prescriptive title.

Id.—Decisions Determining Riparian Rights are Rules of Property.—The prior decisions of the supreme court determining the relative rights of riparian proprietors to the flow of the water of a

CLXIX Cal.—27

stream have become rules of property in this state, and should not now be disregarded.

ID.—ARTIFICIAL CHANGES IN NATURAL WATERCOURSES NOT AFFECTING THEIR CHARACTER—RIPARIAN RIGHTS NOT LOST BY CHANGES.—Sloughs, originally natural channels of the San Joaquin River, and situated thereon above the slough to which the defendant's land is riparian, by being deepened, or by having their waters controlled by weirs or floodgates, or by having some of their waters carried by ditches and canals to lands not riparian to the sloughs, did not lose their character as natural watercourses, with the result that those lands which still lay along their natural channels ceased to be riparian, and those lands strictly riparian to the San Joaquin River and which were supplied by its waters through the ditches and canals leading out of the sloughs also ceased to be riparian.

ID.—APPROPRIATION FOR BENEFICIAL PURPOSES—PRESCRIPTIVE TITLE.—The use of the water conveyed by such sloughs for irrigation and domestic purposes on land nonriparian either to the San Joaquin River proper or to the sloughs, is held to have been open, notorious, and in interference with the flow of the river waters to the lower slough to which the defendant's land is riparian, and to have given to the appropriators a prescriptive right to continue such use.

APPEAL from a judgment of the Superior Court of Fresno County and from an order refusing a new trial. George E. Church, Judge.

The facts are stated in the opinion of the court.

Frank H. Short, Edward F. Treadwell, and J. P. Langhorne, *Amicus Curiae*, for Appellants.

N. C. Coldwell, W. C. Graves, J. M. O'Brien, and L. P. Spalding, for Respondents.

SHAW, J.—The plaintiffs have appealed from certain parts of the judgment, and from an order denying their motion for a new trial.

This action was begun in 1899 by the predecessors in interest of the present plaintiffs. Judgment was entered against the predecessor in interest of the plaintiff canal company, it appealed therefrom and on appeal the cause was on February 12, 1904, remanded by the supreme court with directions to the lower court to enter a certain judgment in favor of said plaintiff. (*Miller & Lux* v. *Enterprise Canal Co.*, 142 Cal. 208, [100 Am. St. Rep. 115, 75 Pac. 770].) On March 28,

1904, the lower court entered judgment in accordance with the aforesaid mandate. Pending this appeal the defendants had instituted a motion for a new trial upon the ground, among others, that the evidence was insufficient to support the decision, and the lower court had on June 27, 1902, ordered a new trial accordingly. From this order an appeal had been taken and on January 3, 1905, the order granting the new trial was affirmed by this court. (*Miller & Lux* v. *Enterprise Canal Co.*, 145 Cal. 652, [79 Pac. 439].) Although the entry of the judgment in pursuance of the mandate of this court was in point of time subsequent to the order granting the new trial, nevertheless that order, in effect, vacated and set aside that judgment, as well as the original judgment which was the subject of the former appeal. As a result, the order granting a new trial set the entire case at large and gave the lower court authority to try the whole case anew. (1 Hayne on New Trial, secs. 2 and 167; *San Jose Bank of Savings* v. *Bank of Madera*, 121 Cal. 545, [54 Pac. 85]; *Knowles* v. *Thompson*, 133 Cal. 247, [65 Pac. 468]; *McDonald* v. *McConkey*, 57 Cal. 325; *Naglee* v. *Spencer*, 60 Cal. 10; *Kent* v. *Williams*, 146 Cal. 3, [79 Pac. 527].)

There was a new trial of the cause resulting in the judgment now under review.

The original plaintiffs were corporations, named respectively, Miller & Lux and The San Joaquin and Kings River Canal & Irrigation Company. The names of the present plaintiffs are the same, except that the word "Incorporated" is added to each name. Since the action was begun, the defendant, James Canal Company, has succeeded to the interests of the Enterprise Canal & Land Company, and the J. G. James Company has succeeded to the interest of Jefferson G. James. Substitutions of parties have been made in accordance with these changes in interest.

To an understanding of the issues a statement of the facts is necessary. Many of the facts are set forth in the cases within cited and others in the case of *Turner* v. *James Canal Co.*, 155 Cal. 82, [132 Am. St. Rep. 59, 17 Ann. Cas. 823, 22 L. R. A. (N. S.) 401, 99 Pac. 520]. The hydrographical and geographical situation presented by this case is exceptional, if not unique. The San Joaquin River having its source in the snow-clad mountains of the Sierras flows westerly on to the level plain or valley bearing its name. At a point

near the center of the valley it makes an abrupt turn northerly. At this point, and immediately below the turn, plaintiffs have for many years maintained a dam to check the flow and impound the waters of the river. On the left or westerly bank of the river and immediately in line with the center of the stream in that part of its course above where it makes the turn northerly, is the headgate or intake of a large canal belonging to the plaintiff canal company, through which for many years it has diverted the waters of the river for useful purposes. A short distance above this headgate and in line with the course of the river as it flows northerly from its turn and on the left or southwesterly bank of the stream, is the junction of the San Joaquin River and Fresno Slough. Fresno Slough is a well defined channel extending southerly from its junction with the river for some twelve or fourteen miles. During times of extreme high water the waters of Kings River flowing into the San Joaquin Valley from the Sierras some thirty miles south of the San Joaquin, are carried northerly into Fresno Slough and thence on down to the San Joaquin River. At such times, of course, Fresno Slough is a channel of Kings River and the lands abutting upon it are riparian to Kings River. But at such times the San Joaquin River itself is carrying an abundance of water, the excess waters are not needed and are not used, and are rather a detriment than a benefit to the landowners. Such excess waters are not here in controversy. In all other stages of the San Joaquin River its waters find their way into and up Fresno Slough and rise and fall, or stand there, at practically the same level as that of the San Joaquin River itself. It is at these times and under these conditions that the ownership and right of use of the waters of the San Joaquin and of Fresno Slough become important. Fresno Slough has no source of supply other than the San Joaquin River except a small portion of surface water flowing into it from its immediate watershed during ordinary rains and the occasional floods from Kings River. These surface waters, however, do not seem to have been considered important in the consideration of the case and may be dismissed without further remark. The necessary effect of these conditions is that, except during the unusual floods from Kings River, and except said surface waters, the waters of Fresno Slough remain stationary or rise and fall precisely as do the waters of the San Joaquin River, the waters of the slough

being absolutely governed and controlled thereby. The lands of the J. G. James Company, the rights pertaining to which give rise to this litigation, are not riparian to the San Joaquin River proper, but are riparian to Fresno Slough. By virtue of that fact they are also riparian to the San Joaquin River, itself, except when the waters of Kings River are flowing therein. (*Turner* v. *James Canal Co.*, 155 Cal. 82, [132 Am. St. Rep. 59, 17 Ann. Cas. 823, 22 L. R. A. (N. S.) 401, 99 Pac. 520].) The plaintiffs are owners of large tracts of riparian land situated both above and below the connection of Fresno Slough with the San Joaquin River and are appropriators of large quantities of water, in part taken out by means of said canal and devoted to beneficial uses upon the lands of persons to whom said water is sold, and in part by other canals and sloughs and used upon their own lands. The J. G. James Company asserted the right to go above the intake of the said canal and above the riparian lands of the plaintiffs, Miller & Lux, abutting on the eastern bank of the main river above the junction of the slough, and by a canal owned by the James Canal Company, to take water away from the main stream and to carry it and use it upon the lands of the James Company riparian to Fresno Slough. The plaintiffs contested this right. They insisted that even if there were riparian rights pertaining to the lands of the James Company by reason of their situation upon Fresno Slough, such rights could be exercised only by taking water from the slough itself, in subordination to the rights of the plaintiff canal company, and to the riparian rights of the plaintiffs' land situated above the junction of the slough and the river. The court below awarded to the James Company the right to take out of the San Joaquin River at the head of the James Canal Company's canal, above the land of the plaintiffs, and carry through said canal to the James Company's land, the reasonable quantity of water to which said land was entitled by reason of its situation as land riparian to Fresno Slough, and declared that this right was superior to the rights of the intervening lands of the plaintiffs and also to the right of the plaintiff canal company to take water out of the river through its said canal. It is this claim which constitutes the gravamen of these appeals.

The principal contention of the appellants regarding the canal is that, by means of their dam below the northerly turn of the San Joaquin River and said canal heading near the

junction of the river and Fresno Slough, the plaintiff canal company has diverted from the river and put to beneficial uses a stream of seven hundred and sixty second feet of water, for a period of time sufficient to give it a prescriptive title or right to continue such diversion, and that this right is superior to any riparian right pertaining to the lands of the J. G. James Company abutting on Fresno Slough. That said plaintiff has acquired such prescriptive right or title against all persons as to whom the said diversion has been hostile and adverse, is shown by abundant evidence, and is practically conceded. (See *Stevinson* v. *San Joaquin and Kings River Canal & Irrigation Co.*, 162 Cal. 141, [121 Pac. 398], where this right was established against a lower riparian proprietor.) The claim of the defendant J. G. James Company is that the diversion of water by the plaintiffs' canal and dam has not interfered with the riparian rights pertaining to its lands abutting upon Fresno Slough and hence that it has not been hostile or adverse to those rights, and therefore, that it has not created a title against them by prescription. The court below sustained this claim of said defendant. In support thereof in finding 44, it declared as follows:

"From time immemorial all of the water flowing from the said San Joaquin River into said Fresno Slough has been accustomed to naturally flow, and does now naturally flow, from said river into said slough, and over, upon, along and by the lands of the defendant, J. G. James Company, in these findings before particularly described, and out of said slough into said river, at a point on the course of said river above the point on said river where said main canal of said plaintiff commences and has its place of diversion. And the construction, maintenance and operation of said main canal does not now impede or prevent, and never has impeded or prevented the natural flow of any water from said San Joaquin River into the said Fresno Slough."

The main canal here referred to is the canal of the plaintiffs above mentioned heading into the San Joaquin River immediately below its junction with Fresno Slough.

The theory of the court below was, and that of the defendants is, that, so far as said canal is concerned, the owners of lands on Fresno Slough are upper riparian proprietors not affected by the lower diversion and use of the waters of the stream, and, pursuant to this theory, in finding 46 it further

said: "The taking and diversion of such water, either out of said slough or out of the main channel of the said San Joaquin River," when the river is flowing into the slough, "does not cause and will not cause . . . any damage to plaintiff . . . or to either of them."

The question thus presented relates only to the waters of the San Joaqiun River. It does not relate to the waters of Kings River or to the surface waters above mentioned when such waters flow northerly through the slough into the San Joaquin River, and no controversy over the right of the J. G. James Company to a reasonable share of such waters appears to exist.

It should be further noted that the rights claimed by Miller & Lux to receive water from said canal for use on its lands are derived through and depend upon the title of the co-plaintiff to the canal and water and need not be separately considered. The plaintiff canal company is the sole owner of the canal and of the right to divert water therein.

Under the established law of riparian rights, a title by prescription cannot be acquired against a tract of riparian land by diverting the water from the stream at a point below such land, and not interfering with the stream at the riparian land. Thus it is said in *Bathgate* v. *Irvine,* 126 Cal. 141, [77 Am. St. Rep. 158, 58 Pac. 447] : "The lower appropriator invades no right of the upper riparian proprietor. The latter has no right to prevent such use, for he is in no wise injured, and the former should not be permitted to acquire a right in this manner which the latter is powerless to prevent." (See, also, *Hargrave* v. *Cook,* 108 Cal. 78, [30 L. R. A. 390, 41 Pac. 18] ; *Hanson* v, *McCue,* 42 Cal. 310, [10 Am. Rep. 299] ; *Lakeside Ditch Co.* v. *Crane,* 80 Cal. 183, [22 Pac. 76].) Under this rule, assuming that the land of the James Company is riparian land situated above the point of plaintiffs' diversion, without further qualifying conditions or circumstances, the claim of a prescriptive right against the James Company cannot be sustained.

Recognizing the force of this rule, the appellants make the further claim that the water taken into the canal is devoted to public use and that the defendants cannot now prevent such use, but are confined to a claim for damages estimated by the value of their riparian rights. It appears from the findings that said canal is seventy-five miles long and that a large part

of the water taken into it has been for many years carried down and applied to the public uses of supplying several farming neighborhoods with water for irrigation and five or six towns or villages along its course with water for domestic use. It further appears from the evidence that Jefferson G. James, who, up to the time the action was begun, was the owner of the James lands, was at all times fully aware of the fact that this water was taken for public use and was so applied, and also of the method and place of diversion from the river. It does not appear that he ever made any objection to such diversion or use until this action was begun. Upon these facts, the plaintiff canal company contends that the interests of the public have intervened so as to prevent the James Company from asserting a right to take and use on its land the waters of Fresno Slough, if such taking will interrupt or destroy the said public uses, and that said defendant, as against said public uses, cannot take the water, but can only sue for compensation for its riparian rights thus appropriated by the public.

The general doctrine thus invoked is well established in this state. It has been applied and defined in the following cases: *Fresno etc. Co.* v. *Southern Pacific Co.,* 135 Cal. 202, [67 Pac. 773]; *Southern C. Ry. Co.* v. *Slauson,* 138 Cal. 342, [94 Am. St. Rep. 58, 71 Pac. 352]; *Katz* v. *Walkinshaw,* 141 Cal. 136, [99 Am. St. Rep. 35, 64 L. R. A. 236, 70 Pac. 663, 74 Pac. 766]; *Crescent Canal Co.* v. *Montgomery,* 143 Cal. 248, [65 L. R. A. 940, 76 Pac. 1032]; *Newport* v. *Temescal W. Co.,* 149 Cal. 531, [6 L. R. A. (N. S.) 1098, 87 Pac. 372]; *Barton* v. *Riverside Water Co.,* 155 Cal. 509, [23 L. R. A. (N. S.) 331, 101 Pac. 790]; *Gurnsey* v. *Northern Cal. Power Co.,* 160 Cal. 709, [36 L. R. A. (N. S.) 185, 117 Pac. 906]; *Burr* v. *Maclay etc. Co.,* 160 Cal. 280, [116 Pac. 715]. These cases for the most part relate to public uses which involved a physical entry upon the land of the private owner, or an actual invasion of property rights belonging to him. It is now insisted that the reasons upon which it is founded justify and demand the extension of the rule to cases of an upper riparian owner who, without using the water himself on his riparian land, has knowingly stood by while the water has been diverted from the stream, after it had passed his land, and applied to a public use in quantities inconsistent with the use by him of the water of the stream on his own land. It is also claimed that,

even if the rule cannot go to this extent, yet that, under the circumstances of this case, it should be applied to the defendants and should debar them from other remedy than an action for damages.

The importance of these questions demands a careful examination of the decisions on the subject to ascertain the principles and reasons upon which they rest.   The cases of *Fresno etc. Co.* v. *Southern Pacific Co.*, 135 Cal. 202, [67 Pac. 773], and *Southern C. R. Co.* v. *Slauson*, 138 Cal. 342, [94 Am. St. Rep. 58, 71 Pac. 352], each involved the use of a right of way over a parcel of land, the railroad having been built thereon either by agreement with, or with the consent and acquiescence of, the landowner.   Speaking of the right to sue in ejectment, the court, in the Fresno case, says: "A failure to bring an action, where the right exists, until after the public interests have intervened, will prevent its successful prosecution.   Acquiescence for a considerable period after the railroad company has entered upon its duties will defeat the action to recover possession."   In the Slauson case, on the same subject, it is said: "A railroad is, in a sense, a public highway," and if the owner of the land consents to its use for a railroad and it is thereupon so used, this "is a dedication of the same to a public use," the operation of the road thereafter is in the interests of the public, "and cannot be interrupted by an action to recover possession of any part thereof in the interest of a private party."   In *Crescent Canal Co.* v. *Montgomery,* 143 Cal. 248, [65 L. R. A. 940, 76 Pac. 1032], the land in question was used as a right of way for the extension of an irrigating canal for four years, without any objection by the owners and with their tacit consent.   Speaking of the effect of the extension of the canal upon the community enjoying the use of water therefrom, the court said: "The establishment of such a community with the improvements and expenditures necessarily involved was one of the results of the acquiescence of Poyser and Johns in the extension and increased efficiency of the canal.   They may have had a right to demand or receive a reasonable compensation for any damages to their lands caused by such extension.   But they had no right to abate the canal by action, and no right to injure or destroy it."

In *Katz* v. *Walkinshaw,* 141 Cal. 136, [99 Am. St. Rep. 35, 64 L. R. A. 236, 70 Pac. 663, 74 Pac. 766], speaking of the

right of one owner of land underlaid by water-bearing strata to enjoin another from pumping out the water for the irrigation of lands outside the water-bearing area, the court says: "Where the complainant has stood by while the development was made for public use, and has suffered it to proceed at large expense to successful operation, having reasonable cause to believe it would affect his own water supply, the injunction should be refused."

The same question arose in *Newport* v. *Temescal etc. Co.,* 149 Cal. 531, [6 L. R. A. (N. S.) 1098, 87 Pac. 372], and *Barton* v. *Riverside Water Co.,* 155 Cal. 509, [23 L. R. A. (N. S.) 331, 101 Pac. 790]. Newport sued to enjoin the pumping of water from a tract of land situated some five or six miles from his own land, such water being carried away and applied to public use outside of the watershed. This had continued for three years with his knowledge and without objection by him. The court stated the rule in these words: "Where the interests of the public are involved and the court can arrive in terms of money at the loss which plaintiff has sustained, an absolute injunction should not be granted, but an injunction conditional merely on the failure of the defendant to make good the damage which results from its work. Such action, if successful, should be regarded in its nature as the reverse of an action in condemnation. The defendant in effect would be held to be damaging private property without just compensation first made to the owner, and, failing to make such compensation, should be enjoined from further damage."

In the Barton case the court bases the rule upon the facts that the landowner knew, or had reason to believe, that the water tended to exhaust the landowner's supply, that it was being used outside of the common basin by a community which had established itself there in reliance upon that supply, that it was being used there in reliance upon that supply, and that the owners had stood by for nine years without complaint or protest. These two cases referred to the taking of percolating waters from water-bearing strata common to lands of both plaintiff and defendant, which injured the plaintiff, by drawing the water from under his own land.

A similar condition existed in the case of *Burr* v. *Maclay etc. Co.,* 160 Cal. 280, [116 Pac. 715]. The court there said that the rule "has for its basis chiefly the inconvenience of the

public if the service is interrupted by the issuing of an injunction to restrain the use.''

The question was more thoroughly considered in *Gurnsey* v. *Northern Cal. Power Co.*, 160 Cal. 709, [36 L. R. A. (N. S.) 185, 117 Pac. 906], than in any previous case.   Under a franchise from the board of supervisors the defendant had built and maintained a power line over lands of plaintiff which he had dedicated to the public solely for use as a public highway. The power line was erected without his permission but with his knowledge and without objection from him.   It did not interfere with any use he was making of his land or of the highway, but the court held that it constituted an additional servitude and was an invasion of his property right in the soil.   Referring to the cases above cited, the court said that the principle upon which the right to maintain ejectment was denied in such cases was ''that as public interests had intervened through the construction and operation of these public agencies before the actions in those cases were commenced, any right of the parties to disturb them in their possession of the property was thereby lost, and only an action to recover compensation for the land taken could be available.   In principle there can be no difference, as far as the application of the rule of public policy is concerned, whether the entry is by the original consent of the owner, or he permits it to be made and attempts to assert no right until after the public interests have intervened. . . . The principle which underlies this rule is not based upon any considerations of rights pertaining to the public service corporation itself, but solely upon considerations of public policy. . . . This rule is not based so much on the application of the doctrine of estoppel, under which an owner of land, who remains inactive and permits a public service corporation . . . to enter upon his land without right and expend large sums of money in constructing and building the work, will be deemed to have acquiesced in the entrance, so that all remedies save one for compensation will be denied him.   It is based mainly on the great principle of public policy under which the rights of the citizen are sometimes abridged in the interests of the public welfare. . . . Public policy requires that, under such circumstances, the remedy of ejectment should be denied to plaintiff, when the effect of a judgment in such an action would be to destroy the efficiency of the electric line system,''

by taking possession of part of it, "and thus destroying the public rights which have intervened."

The question received elaborate treatment in *Indiana B. & W. Co.* v. *Allen*, 113 Ind. 583, [15 N. E. 446]. In that action the owner of land had knowingly permitted the railroad to build its main line over his land and to operate the same for many years so that the use by the public had become fixed therein. The court said: "This principle does not rest upon the right of the railroad company so much as upon considerations of public policy. The rights of citizens are often abridged in order that the public welfare may be promoted. Chief among the fundamental maxims of jurisprudence is that which declares 'That regard be had to the public welfare as the highest law,' and this maxim underlies the rule we have under discussion. . . . It goes far enough with us to supply ample ground for denying to one who has slept upon his rights a .right to dispossess a railroad company charged with a service public in its nature, and important to the social and commercial interests of the country. Compensation he may recover, possession he cannot." And again: "All these interests, and more, combine in demanding that a citizen who has stood by until after the completion of a line of road has involved public interests, shall not be allowed to sever and destroy its efficiency by wresting possession of part of it from the company. The case does not stand upon the ordinary doctrine of estoppel. The great principle of public policy enters as an important factor and controls the judgment of the court. Nor is there any great hardship upon the landowner in yielding to its dominion. Ample remedies are open to him. He may demand and secure full compensation. He may do more, for he may invoke the strong arm of the courts, but, to do this with success, he must move before the public interests are involved. If he remain inactive, better that he suffer, if some one must suffer, than the community. But he need not suffer, for compensation, if seasonably asked, will always be awarded him, although possession will be denied." And further, referring to the argument that the defendant was a married woman, under the disability of coverture, so that her action in ejectment was not barred, the court denied this claim and said: "In cases of condemnation and dedication, as shown by the authorities (citing *Indianapolis* v. *Kingsbury,* 102 Ind. 219,

[51 Am. Rep. 749]), the ordinary rules do not apply.    Certainly this must be so where public policy controls, for no one can do what public policy demands shall not be done.    Once it is granted that the public welfare demands that a line of railway shall not be severed by a possessory action, it must inevitably follow that the disability of coverture will not avail, since the rights of the public are paramount to all others.    No one can do what public policy forbids.    Coverture may prevent the running of the statute of limitations in jurisdictions where it is recognized as a disability; in ours it is doubtful whether it can do so much, but surely, it may not, in any jurisdiction, prevail against a rule of public policy.''

There are many cases in other states declaring the same reasons for the rule.    (*McAuley* v. *Western etc. Co.*, 33 Vt. 321, [78 Am. Dec. 627]; *Mitchell* v. *New Orleans etc. Co.*, 41 La. Ann. 368, [6 South. 522]; *Bourdier* v. *Morgan etc. Co.*, 35 La. Ann. 947; *Reichert* v. *Railway Co.*, 51 Ark. 500, [5 L. R. A. 183, 11 S. W. 696]; *Hanlin* v. *Chicago etc. Co.*, 61 Wis. 530, [21 N. W. 623]; *Goodin* v. *Cincinnati*, 18 Ohio St. 169, [98 Am. Dec. 95]; *Roberts* v. *Northern P. R. R. Co.*, 158 U. S. 11, [39 L. Ed. 873, 15 Sup. Ct. Rep. 756]; *Northern P. R. R. Co.* v. *Smith*, 171 U. S. 271, [43 L. Ed. 157, 18 Sup. Ct. Rep. 794]; *Northern Pac. R. R. Co.* v. *Murray*, 87 Fed. 651, 31 C. C. A. 183]; *Saunders* v. *Memphis etc. Co.*, 101 Tenn. 206, [47 S. W. 155]; *Buckwalter* v. *Atchison etc. Co.*, 64 Kan. 403, [67 Pac. 831]; *Holloway* v. *Louisville etc. Co.*, 92 Ky. 244, [17 S. W. 572]; *Provolt* v. *Chicago etc. Co.*, 57 Mo. 262; *Chicago etc. Co.* v. *Englehart*, 57 Neb. 447, [77 N. W. 1092]; *Omaha etc. Co.* v. *Redick*, 16 Neb. 313, [20 N. W. 309]; *Kakeldy* v. *Columbia etc. Co.*, 37 Wash. 680, [80 Pac. 205].)    Upon similar reasons it is held that a part of the right of way of a railroad cannot be severed from the remainder of the public franchise and sold on execution against the railroad company, or for local taxation, unless it is expressly authorized by statute.    (*Southern C. R. Co.* v. *Workman*, 146 Cal. 84, [2 Ann. Cas. 583, 79 Pac. 586, 82 Pac. 79].)

In substance, the doctrine established by these decisions, though not, strictly speaking, the doctrine of prescription, at least amounts to this: That where a person has suffered property belonging to him and under his control to be taken and devoted to a public use by one engaged in administering such use, and the matter has gone on so far that the beneficiaries

thereof rely on its continuance and adjust their affairs accordingly, such owner having knowledge thereof and making no objection or protest, this conduct will be regarded by the courts as a dedication by such owner of the property to the particular public use, and he cannot thereafter interrupt nor prevent the same, his only remedy being to seek compensation for the property he has thus allowed to be taken, or as indicated in the Newport case.  Upon this statement of the doctrine we proceed to examine into the circumstances of the case.

It is to be observed that in all of the above cases the public use involved an interference with the property rights of a private owner, sufficient to give such owner an immediate right of action to abate or prevent the same.  In the Gurnsey case, the power line in the public road did not interfere with any private use which the owner desired to make of the land constituting the road, but it was an appropriation of the soil in which he owned the fee to uses to which he had not originally dedicated it.  In the percolating water cases, the pumps would draw water from under the plaintiff's land and lower the water level thereunder.  This, in effect, was a direct invasion of the plaintiff's rights which he might have enjoined by suit as soon as the injury was threatened.  (*Katz* v. *Walkinshaw,* 141 Cal. 136, [99 Am. St. Rep. 35, 64 L. R. A. 236, 70 Pac. 663, 74 Pac. 766].)  This right in the owner to enjoin the public use before it had become established, appears to have constituted an important factor in the statement of the doctrine in all of the above cases.  This right of action, as we have seen, does not exist in favor of an upper riparian owner against one who diverts water from the stream at a point below his land.  It is true that, in case of a diversion for public use, such upper proprietor must be supposed to take cognizance of the fact that the people below may rely on his disuse, expect a continuance thereof, take the water which he has allowed to pass and adjust their affairs to that condition, as if possessed of a permanent right.  He must also know that, except where the water is abundant, a subsequent taking thereof by him for use upon his own land will deprive the public of it and that the consequences of such deprivation will usually be exceedingly grave.  These questions present serious practical difficulties, and as we think that the circumstances of this case place the defendants in a

different situation from that of an ordinary upper riparian owner, we prefer to express no opinion concerning the application of the doctrine to such owners in general, but confine our decision to the particular case shown by the evidence herein.

There is no direct evidence to support the finding that the operation of the plaintiffs' main canal does not impede or prevent the natural flow of water from the San Joaquin River into Fresno Slough, or the finding that the taking of water out of such slough by the James Company will not cause any damage to plaintiffs. The evidence on the subject is merely to the effect that when from any cause the level of the water in the river is higher than the level of the water in the slough, the water will flow from the river into the slough, and that when the conditions are the opposite, the water will flow from the slough into the river. No evidence was necessary to prove either of these propositions. They are the necessary result of the operation of the natural law of gravity, the level of the river and slough being practically the same, and judicial notice would be taken thereof. It was also shown that the effect of the dam placed in the river by the plaintiff canal company, when kept at its usual height, was to raise the water of the river above its natural level and force it back up the river about three-quarters of a mile, and also to back the water up the slough and along by the land of the James Company to a distance of ten miles above the dam. The findings mentioned are really conclusions which the court deduced from these facts. The facts do not justify the conclusion. The force of gravity must, of necessity, control the action of water under given circumstances. The case is not like unto that of a stream permitted to pass the land of a riparian owner. On the contrary, the dam stops it in its course and forces it back a long distance up the stream and up the slough until it reaches approximately the level maintained at the dam. In this way the dam impounds the water designed to be taken, and it is the water so impounded that the plaintiff canal company has taken. The space at the common junction of the river, the slough and the canal is nearly square and about six hundred feet each way across. This space, with that between the banks of the river and slough, respectively, as far up as the back water extends, form a reservoir which the plaintiff has made and used for

the purpose of diverting this water thereby, as one part of its system. This reservoir is partly upon the land of the James Company and extends for a distance of several miles up the slough over its land. This use of the James land for the purposes of plaintiff's canal, was continued for many years with his knowledge and without objection. It must be conceded that these operations of said canal company have and do materially interfere with and change the natural flow of the water in the river and in the slough in its course through the James' land. If the flash boards be placed in the dam so as to raise the water of the river above its natural level, the headgate of the canal being closed, the water will, of course, back up into the slough, forcing more water into it than it would receive by the normal action of the stream. If, then, the headgate be opened, it will relieve the back pressure and the slough will receive less. If the dam is maintained so as to allow all the natural flow to pass down the river without raising its level, some water will pass into the slough to replace natural evaporation and seepage and, if the river is then rising, to fill the slough to the level of the river. At such times, if the headgate is opened it will take a large quantity of water from the river at the junction, lower its level accordingly, and cause less water to flow into the slough. Measuring around what may be called the perimeter of the junction, the headgate may be as much as three hundred feet from the mouth of the slough, but it is not so far away, the lines of the banks and the rate of flow of the stream being considered, that the taking out thereat of a flow of seven hundred and sixty second feet would not lower the surface level at the mouth of the slough. Such a flow is no insignificant stream, being the equivalent of a stream two hundred feet wide and 3.8 feet deep moving at the rate of one foot per second. When from any cause the water runs out of the slough into the river, the headgate of the canal is, with respect to that current, below the James' lands. But when the water runs from the river into the slough, it is, with respect to that current, above the James' lands, and it is so near to the course of the current from the river into the slough that the diversion of seven hundred and sixty second feet through the headgate must of necessity draw water from that current and diminish the quantity passing into the slough. When the water at the junction is stationary, it is similar to a lake

or pond, and the diversion of so large a quantity into the
headgate must lower the level of the entire body and draw
water both from the slough and the river. (*Duckworth* v.
*Watsonville etc. Co.*, 150 Cal. 528, [89 Pac. 338] ; *Turner* v.
*James Canal Co.*, 155 Cal. 82, 91, [132 Am. St. Rep. 59, 17
Ann. Cas. 823, 22 L. R. A. (N. S.), 401, 99 Pac. 520].). These
consequences would be more plainly apparent if the James
Company should actually take water out of the slough and use
it on its lands. This would at once start a current from the
river into the slough to replace the water so taken. This cur-
rent would pass very near the headgate of the canal. The
opening of the headgate at such times would inevitably divert
into the canal water that would otherwise pass into the
slough. This would be the result alike when water stands at
the natural river level, and when it is backed up the slough
by the dam. The two uses, if made simultaneously, would
necessarily be inconsistent and antagonistic. For these rea-
sons, the finding cannot be true that the natural flow of the
water from the river into the slough is not and never has
been impeded by the operation of said canal.

Likewise, the statement that the taking of water out of the
slough by James to be used upon his lands would not damage
the plaintiff, cannot·be true, except upon the hypothesis that
the plaintiff has no right to the water. In that case it would
suffer no legal damage, but actual damage must of necessity
ensue. If the plaintiff has a right thus to take the water
such diversion by the defendant would cause it legal damage.

These conditions have been maintained by the plaintiff
canal company at all ordinary stages of the river, for more
than twenty-five years before this action was begun. In reli-
ance upon the continuance of this water supply, towns and
villages have grown up and hundreds of irrigated farms have
been established in the district supplied by said plaintiff's
canal. With all these circumstances James was familiar and
he gave no warning of any objection to such use, but suffered
it to continue. His land along the slough was used by the
canal company as a part of its reservoir in which to collect
the water for distribution. By that means the water has
been taken all these years, with his knowledge and tacit con-
sent. To permit him or his successor now to take out the
water therein stored for diversion by said canal company,
would, in effect, permit him to destroy or seriously impair

and injure the water system of which his property has constituted an important part and in the establishment of which he has acquiesced. Every consideration of regard for the general welfare and public good, so much emphasized in the decisions above' mentioned, applies with the greatest force to the conditions here shown. He was not, as in the case of an upper riparian owner, powerless to interfere with the use of the water. He could have maintained an action to prevent the backing up of the water on his land to form the reservoir and force the water into the canal and to prevent any interference with the flow into the slough. The doctrine is applicable to him and to the James Company as his successor.

Therefore, the plaintiff canal company is entitled to continue its diversion for public use as it has heretofore done and the J. G. James Company cannot be allowed to interfere with that use. The part of the judgment which declares that the J. G. James Company may, when the water of the river is flowing into Fresno Slough, take the same and use it on its riparian land along the slough, regardless of the effect of such taking to diminish the flow into said plaintiff's canal to an amount less than seven hundred and sixty second feet, is, to that extent, erroneous. The defendants cannot be allowed to divert the water so as to cause such diminution, or so as to prevent that quantity from flowing into said canal.

What has been said with respect to the taking of water from Fresno Slough by the J. G. James Company for the irrigation of its land, applies also to the taking of water for the same purpose from the San Joaquin River through the Enterprise canal, now maintained by the James Canal Company. As Jefferson G. James, by his acquiescence in the public use of the water by the plaintiff canal company, has, in effect, dedicated to that public use the riparian rights pertaining to the James' land, to the extent required therefor, he, or his successor, cannot be allowed to regain those rights by the expedient of going up the river and there diverting the water to the same riparian land through the Enterprise canal. If the James Canal Company be regarded as a mere appropriator of water from the stream above the plaintiff's dam, its diversion is, on well settled principles, unlawful as against the plaintiff's prior appropriation below, so far as it is injurious thereto.

The respondents question the proposition that the plaintiff canal company is devoting the water it takes into its canal to public use. The parties stipulated in writing, for the purposes of the trial, that the said canal company had, for the five years immediately preceding the commencement of the action, continuously diverted into its canal and appropriated the seven hundred and sixty second feet of water in controversy, and that "all of said water during all of said time, was sold, rented, supplied and distributed to others, including a part thereof to the plaintiff, Miller & Lux, for purposes of irrigation, the watering of stock and domestic and other beneficial uses, and that beneficial use was made of said water so appropriated, and all thereof." This was incorporated into and made part of the findings of the court. The court also found that many thousands of acres of land, occupied by a large number of persons as owners or tenants, were irrigated with water from said canal, and that they had thereon many thousands of acres of growing crops of grain, fruits and other crops. The evidence shows that there were many hundreds of such persons. And, as before stated, a number of villages have grown up along the canals, the inhabitants of which receive water therefrom for their lands and for domestic use. The use described in the stipulation, and the facts disclosed by the uncontradicted evidence, show that the water was devoted by the canal company to public use. There is no merit in the contention to the contrary. It may be that some of it has been disposed of to Miller & Lux at rates more advantageous than to others; but that is an abuse which the proper public authorities may prevent or regulate; it does not convert the use into a private use.

Upon a former hearing of this case an opinion prepared by Mr. Justice Henshaw was rendered by the court in Bank in pursuance of which the judgment was modified in certain particulars. This opinion embraced all of the points involved in the case. A rehearing was granted by the court, solely for the purpose of again considering the questions relating to the public use of waters taken by the San Joaquin and Kings River Canal and Irrigation Company, Incorporated, upon which we have now reached the conclusions heretofore stated. The portions of the opinion relating to the other matters presented by the appeals were and are satisfac-

tory to the court, and we now adopt the same as the opinion
of the court upon this hearing.  They are as follows:

"Entirely different are the questions presented by the
second branch of this appeal.  The James Company was not
alone awarded the right to the use of a reasonable *quantum*
of water from Fresno Slough, but was given the further right
to divert this water from the San Joaquin River proper, the
point of diversion being, by the meanderings of the river,
some twenty miles above the junction of Fresno Slough with
the San Joaquin River, and something more than ten miles
above in a direct line.  There was thus accorded the right to
the James Company to go above their lands and above the
lands of intervening owners to divert water for riparian
use.  That this may be done when it may be done without
interference with the rights of the lower riparian proprietors,
that is to say lower than the land upon which the water is to
be used, has been decided and is not questioned.  (*Turner* v.
*James Canal Co.,* 155 Cal. 82, [132 Am. St. Rep. 59, 17 Ann.
Cas. 823, 22 L. R. A. (N. S.) 401, 99 Pac. 420].)  But it is
contended that the permission thus awarded the James Land
Company here works an illegal and unwarranted interference
with the plaintiffs as intervening riparian proprietors, as well
as an interference with their rights to water through the
canal.  Before entering upon this consideration something
more needs to be said of the geographical conditions.  The
court decreed that this reasonable quantity could be diverted
through the Enterprise canal, now controlled by the James
Canal Company.  Between the intake of the Enterprise canal
to the east and the junction of Fresno Slough with the San
Joaquin River to the west, a distance of some twenty miles
by the meanderings of the river, plaintiff Miller & Lux owns
large tracts of riparian land on the northerly bank of the
stream.  Three sloughs, originally natural channels of the
San Joaquin, take out of the river and cut through these
northerly riparian lands.  The first of these and nearest to
the head of the Enterprise canal is Aliso Slough.  It for-
merly took water out of the river only at high stages, but it
has been deepened and improved so that it is now able to
and does take water out at lower stages.  Two or three miles
below the head of Aliso Slough is Brown Slough, also a
natural water channel and taking water out of the river
under about the same conditions as does Aliso Slough.  A few

miles below the head of Brown Slough the channel known as Lone Willow Slough leaves the San Joaquin. Into Lone Willow Slough flow Aliso Slough and Brown Slough. Lone Willow Slough carries these commingled waters until it returns them to the main channel of the San Joaquin some thirteen miles below Fresno Slough. It is asserted by appellants, but it is against the findings, that Lone Willow Slough carries water at all stages of the San Joaquin, the amount being about ten per cent of the total flow of the river. The waters of each of these sloughs are controlled by weirs or gates and conducted by canals and ditches to the irrigation of lands. Two canals have been constructed leading out of Lone Willow Slough. The Chowchilla canal diverts water in a northerly direction to the lands of plaintiff and to the distant nonriparian lands of others. The Columbia canal diverts water out of the slough for purposes of irrigation and for many miles conducts this water along or near the bank of the San Joaquin River, distributing it over the riparian land of plaintiffs.

"The further findings declare that the three sloughs above described were originally 'high water' sloughs, that is to say that their beds were so far above the bed of the San Joaquin River at their junctions therewith that they originally received water from the San Joaquin River only during periods of high water and at only such times as Fresno Slough was carrying the waters of Kings River into the San Joaquin; that these sloughs, more than ten years ago, were by plaintiffs and others 'developed, improved, cut down, enlarged and the course and direction thereof changed, and their natural condition changed, and the flow of water therein so regulated, controlled, increased and diminished by artificial means and all of the water flowing therein conducted to and upon the lands, in, over and upon which said sloughs did not naturally run and take their course, whereby the said Brown Slough, Aliso Slough and Lone Willow Slough ceased to be natural sloughs and natural watercourses, and the land, in, over and upon which said sloughs naturally ran, ceased to be riparian lands bordering upon said San Joaquin River, or any branch, watercourse or channel thereof; and said sloughs are not now, and for more than ten years before the commencement of this action have not been, natural branches of watercourses of the San Joaquin River.' The findings pro-

ceed to declare that Miller & Lux have for more than ten years used these sloughs in their changed and artificial condition, taking water from the San Joaquin River to irrigate lands which they own that never bordered the sloughs while the sloughs were in their natural condition, and to irrigate and supply with water lands not bordering upon the San Joaquin River, and to supply water for stock, domestic and other purposes. But it is further found that the taking and the use of these waters through these sloughs 'has never prevented and does not now prevent the flow of water from said San Joaquin River into said Fresno Slough, and over, along and upon the lands of the defendant J. G. James Company'; and the waters of the San Joaquin River 'continued to flow and do now flow into the said Fresno Slough and fill the same as the same were accustomed to do before the taking and diversion of any water from the river through the sloughs.' The purport of these findings is, of course, that these sloughs which naturally took water from the river at its high stages have, by artificial means, been converted from their character of natural watercourses into the character of irrigation ditches or canals, but that neither in their natural state nor in their changed artificial condition did or do they prevent the natural flow of the San Joaquin River into Fresno Slough. True, if, by their changed condition, they were enabled to take and did take more water out of the San Joaquin than when they were in their natural state this would have a direct tendency to reduce at such times the amount of water which would flow from the San Joaquin into Fresno Slough. But it is further found that before and after this change of character in the sloughs the San Joaquin River always continued to flow and to fill Fresno ·Slough in its accustomed manner. The court finds that the defendant James Company has been diverting, and has the right to divert, to its lands through the Enterprise canal a reasonable quantity of water, and that this water can be and is and may in the future be so diverted without injury to any of the lands of plaintiff.

"Appellants insist that under the common-law doctrine of riparian rights, as that doctrine is expounded, not alone by the common law courts and the courts of sister states, but as accepted and declared by the decisions of this state, this may not be done, for that it is well settled that each riparian pro-

prictor is entitled to the full flow of the stream, saving as that flow is reduced by the reasonable use of reasonable quantities of water by upper riparian proprietors, and, second, that the right to such flow is a property right of great value. Respondent answers that it recognizes that the common-law doctrine accepted in sister states is as appellants declare, but that this court has over and over asserted (as it has) that it would not be bound by that doctrine where it was found unsuited to our radically different conditions and needs; that the use of water for irrigation is so highly necessary a use as to demand a modification of the common-law doctrine and the declaration that the lower riparian proprietor may go above an intervening riparian proprietor and take water for use upon his lower lands, provided he can do so without substantial injury to the intervening proprietor; that whether or not substantial injury results is a question of fact to be determined in each case by its circumstances, and that in this case the findings of the court, fully supported, declare that the taking could be made without injury. To this appellants make reply that it will be difficult, if not impossible, to conceive of a case where this could be done without injury, that is to say, without an impairment or destruction of a right of property which has by this court repeatedly been declared to rest with the upper riparian proprietor by virtue of the situation of his lands and his right to the uninterrupted flow of the stream. But that even if a case could be imagined where such a diversion could be made without injury, this is not such a case, and the findings so declaring are without support.

"With this epitome of the diverse contentions of the parties, we may the better proceed to a consideration of the matter. And, first, it is to be remembered that we are here dealing with the correlative rights of riparian proprietors in the matter of irrigation.

"Since the leading case of *Lux* v. *Haggin*, 69 Cal. 256, [4 Pac. 919, 10 Pac. 674], the right of irrigation has been declared to be a part of the riparian owner's rights in the use of water. In many respects, too, definitions and limitations have been put upon the right to use water for irrigation. Thus an upper riparian proprietor, by virtue of his superior location, is not entitled to use all of the water for that purpose to the destruction of the rights of riparian proprietors

below to use their due proportion of the water for the same purpose. Thus it is said: 'The common-law rule, as interpreted in this country, is that the right to the waters of the stream, with certain exceptions not material here, belongs to the riparian proprietors in common and equally, and may be exercised by each as the necessities of the situation may require, only so as not to infringe upon the equal rights of the others.' (*Charnock* v. *Higuerra,* 111 Cal. 473, [52 Am. St. Rep. 195, 32 L. R. A. 190, 44 Pac. 171].) And again it is said: 'It is accordingly well settled here that each riparian owner has a right to a reasonable use of the water on his riparian land, for the irrigation thereof, and that the so-called common-law right of each to have the stream flow by his land without diminution is subject to the common right of all to a reasonable share of the water.' (*Turner* v. *James Canal Co.,* 155 Cal. 82, [132 Am. St. Rep. 59, 17 Ann. Cas. 823, 22 L. R. A. (N. S.) 401, 99 Pac. 420].) And so in such cases as *Harris* v. *Harrison,* 93 Cal. 681, [29 Pac. 325], and *Wiggins* v. *Muscupiabe L. & W. Co.,* 113 Cal. 190, [54 Am. St. Rep. 337, 32 L. R. A. 667, 45 Pac. 160], instead of dividing the flow of the stream in portions, the full flow was apportioned amongst the riparian owners during specified periods of time; and in *Rose* v. *Mesmer,* 142 Cal. 322, [75 Pac. 905], it is said: 'A riparian owner may, for the more convenient use of the water on his riparian land, go upon the land of another farther up the stream, with the consent of such landowner, and there divert the water for use upon land below, or he may raise it to the surface of his land by pumps or other artificial means. In either case his act in so doing is not necessarily different from the exercise of his right as a riparian owner, and such a diversion above his land may or may not be considered as an attempt to make an appropriation of the water independent of the riparian right, according to the circumstances that appear with respect to the particular case.' Of the language of our opinions, which respondent insists favors its contention, these are the strongest and are for that reason quoted. But in no one of them, it will be noted, is there any declaration that a lower riparian proprietor may so go above an upper riparian proprietor and take water without his consent.

"In *Charnock* v. *Higuerra* the exercise of the common and equal right of the riparian proprietors to take and use the

water is carefully limited by the declaration that it must be done 'so as not to infringe upon the equal rights of others.' In *Turner* v. *James Canal Co.*, the lands of the objecting riparian owner were entirely below the James lands upon which it was proposed to use the water.  In *Rose* v. *Mesmer* the right of the lower riparian proprietors to go above his lands to take water is put under the limitation that it be done with the consent of the upper proprietors.  Therefore it is certain that there is no declaration by this court that a lower riparian proprietor may so take his water as matter of right, and in truth the decisions are otherwise.

"It is to be remembered that a riparian proprietor's title to the water begins only when it reaches his land and lasts only so long as it is flowing past his land.  Until it reaches his land he has no title whatsoever and no right other than the protective right to see that the full flow past his land to which he is entitled is not illegally diminished.  Thus it has been said 'Neither a riparian proprietor nor an appropriator has title or ownership in the water of the stream before it reaches his land or point of diversion respectively.  This has been expressly decided with respect to appropriators.  (*Parks C. & M. Co.* v. *Hoyt*, 57 Cal. 46; *Riverside Water Co.* v. *Gage*, 89 Cal. 410, [26 Pac. 889] ; *McGuire* v. *Brown*, 106 Cal. 660, [30 L. R. A. 384, 39 Pac. 1060].)  The same rule applies to a riparian owner.'  (*Duckworth* v. *Watsonville etc.*, 150 Cal. 520, [89 Pac. 338].)  Moreover it is to be noted that as to an upper riparian proprietor the *effect* of a diversion above him is the same whether it be said that the diversion is but a mere appropriation or whether it be said that the diversion is to place and use the water upon lower riparian lands. That an appropriator could not so take the water is not disputed.  The riparian proprietor, as we shall see, would not even be called upon to prove the direct damage.  He would be protected against such a taking because such a taking is an impairment and destruction of his right of property in the water, which right of property, as has been frequently said, is the right to its full flow past his land.  Thus, as early as 1886, in the case of *Stanford* v. *Felt*, 71 Cal. 249, [16 Pac. 900], objection was made by a lower riparian proprietor to the unwarranted use of the water by an upper riparian proprietor, in that the upper riparian proprietor did not permit the surplus waters to return to the stream, and

this court in Bank there declared: 'By the common law of
England, the right of the riparian proprietor to the flow of a
stream is inseparably annexed to the soil and passes with it,
not as an easement or appurtenance, but as part and parcel
of it. Use does not create the right, and disuse cannot de-
stroy nor suspend it. The right of such proprietor extends
to the natural and usual flow of all the water of the stream,
unless when the quantity has been diminished as a conse-
quence of the reasonable use or appropriation of it by other
riparian owners for proper and legitimate purposes. . . . Nor
is the owner lower down the stream required to show, in order
to procure an injunction, any actual present damage.' In
*Heilbron* v. *Water Ditch Co.*, 75 Cal. 117, [17 Pac. 65], in an
action to restrain a diversion it is said: 'And it seems clear,
upon principle and authority, that the diversion of natural
water from land is 'an injury done to the inheritance.' The
flow of natural water over land is a continuous source of
fertility and benefit; and its withdrawal is followed by con-
sequences which are perpetually injurious to the freehold.
. . . The flow of the water of a stream, whether it overflows
the banks or not, naturally irrigate and moistens the ground
to a great and unknown extent, and thus stimulates vegeta-
tion; and the growth and decay of vegetation add, not only
to the fertility, but to the very *substance and quantity* of the
soil.' In *Southern California etc. Co.* v. *Wilshire*, 144 Cal.
68, [77 Pac. 767], the action was to quiet title to the waters
of a certain stream. Both plaintiff and defendant were
riparian owners, the plaintiff being the inferior riparian
proprietor. Defendant was taking waters beyond the water-
shed of the creek, which were thus lost to plaintiffs' lands,
precisely as here, respondents seek to take waters which from
time immemorial have flowed past plaintiffs' lands and to
carry them around and below them. In speaking of such at-
tempt the court said: 'As such riparian owner, it has the
right to have the stream continue to flow through its lands
in the accustomed manner, and to use the same to irrigate
an additional area thereof, undiminished by any additional or
more injurious use or diversion of the water upon the stream
above. This right is a part of the estate of the plaintiff—
parcel in its land—and whether it is or is not as valuable in
a monetary point of view, or as beneficial to the community
in general, as would be the use of a like quantity of water in

some other place, it cannot be taken by the defendants with-
out right, or, in case of a public use elsewhere, without com-
pensation.   It is not necessary in such cases for the plaintiff
to show damages, in order that it may be entitled to a judg-
ment.   It is enough if it appears that the continuance of the
acts of the defendants will deprive it of a right of property,
a valuable part of its estate.'   Again, in *Anaheim etc. Co.* v.
*Fuller,* 150 Cal. 327, [11 L. R. A. (N. S.) 1062, 88 Pac. 978],
where the contention was made that the riparian lands of
plaintiff were not injured by an upper diversion, and that he
must show injury to enjoin such diversion, the rule and doc-
trine of the cases previously cited are, after a review of all
of them, strongly reaffirmed.   And, finally, in the case of
*Shurtleff* v. *Kehrer,* 163 Cal. 24, [124 Pac. 724], it is de-
clared: 'The diversion of the water of the stream is an
injury to the freehold of the riparian owner and may be en-
joined without a showing of other immediate monetary
damages.'   Again, calling attention to the fact that the
diversion of the lower riparian proprietor for use of the
water upon his lands is, in its effects, no different from those
which would result if the water were taken by a mere appro-
priator for any other purpose, the conclusion may not be
avoided that this court from the first has declared that this
may not be done and has in this respect affirmed and adopted
the common-law doctrine that the riparian proprietor is en-
titled to the full flow of the stream, reduced only by the
proper riparian uses which may be made of the water by
proprietors above him.   It has said that he may restrain such
a taking without showing damage, upon the broad doctrine of
riparian rights, that the taking itself is an interference with
his freehold which he is entitled to restrain lest it ripen into
a prescriptive right.   And, finally, some of the reasons for
the doctrine are set forth in the quotation of *Heilbron* v.
*Water Ditch Co.,* 75 Cal. 117, [17 Pac. 65].   And it may be
added in this connection that the findings in this case declare:
'And by such natural flow of the waters of said San Joaquin
River, a large part of plaintiffs' lands have been naturally
wet and irrigated and made fit for cultivation and pasture
and have been supplied with water for stock and other agri-
cultural purposes and for all other purposes for which owners
of land bordering upon a running stream have the right to
use the waters thereof, and the waters which have been

diverted by the defendants in this action would, but for such diversion aforesaid, actually flow in and through the main channel of said San Joaquin River, along, by, through, over and upon a large part of plaintiffs lands in the complaint mentioned and herein found to be riparian to said San Joaquin River.'

"Respondents, in yielding a reluctant acknowledgment of the force of these decisions, in effect, request that they be swept aside and ask why 'If a diversion made by a lower owner should defeat in part the natural irrigation of his upper neighbor's land, upon the policy of our laws, it should not be so'? The answer is this: Many questions touching the use of waters arise in this state which were never known to the common law. As those questions arise they will be treated as cases of first impression and the common-law doctrine will or will not be followed as shall seem best for our changed conditions. (*San Joaquin etc. Co.* v. *Fresno Flume Co.*, 158 Cal. 626, [35 L. R. A. (N. S.) 832, 112 Pac. 182].) But this precise question in other forms has been frequently presented and as frequently determined. The rights of the riparian proprietor in this respect have often been defined and his right to this uninterrupted flow of the full stream has been declared to be a valuable right and a part of his title to the soil, as at common law it was also declared. These decisions therefore have become and stand as a rule of property, and at this day to overthrow them would not only work a destruction of property rights, but would result in interminable confusion and litigation in the scrambling efforts of every riparian proprietor to go as far up the stream as possible to get water. The cases at common law, or where the common law was applied, which dealt with this question, were naturally not cases of irrigation. Generally speaking they arose over the diversions of water around an upper proprietor for power or mill purposes. (*Parker* v. *Griswold*, 17 Conn. 288, [42 Am. Dec. 739]; *Kimberly Co.* v. *Hewitt*, 75 Wis. 371, [14 N. W. 303]; *Shamleffer* v. *Peerless Mill Co.*, 18 Kan. 24.) But in *Miller* v. *Baker*, 68 Wash. 19, [122 Pac. 604] the supreme court of Washington, in a case like this, involving rights of irrigation, announces the doctrine here declared.

"The conclusion thus reached, that the respondent may not under the objection of appellants divert its water above their

riparian lands, even under the findings made by the court, renders unnecessary any detailed consideration of those findings. In certain respects the findings are declared to be against evidence, as, for example, the finding that Lone Willow Slough is a high water slough. The evidence tending to show that Lone Willow Slough was not a high water slough, but that at all stages of the river drew water from the San Joaquin is pointed out, and respondents are challenged to produce evidence to the contrary. They do not accept the challenge nor point out such evidence, and it is not to be supposed that this court, under these circumstances, will itself study the record to determine whether or not there be such supporting evidence. Again, the tenor of the court's findings as to the three sloughs—Aliso, Brown, and Lone Willow—seems to be that because they were deepened, and because their waters were controlled by weirs or floodgates, and because some of their waters by ditches and canals were carried to lands not riparian to the sloughs, and therefore not riparian to the San Joaquin River, their whole character as natural watercourses was changed, with the result that those lands which still lay along their natural channels ceased to be riparian, and those lands strictly riparian to the San Joaquin River and which were supplied by its waters through the ditches and canals leading out of these sloughs also ceased to be riparian in character. This of course could not be. Moreover, the deepening of the sloughs so that they could and did take water from the San Joaquin at lower stages than their natural state permitted, did not change their character as natural watercourses, nor can it be said that to control the water of such sloughs by dams, weirs, and floodgates can have the effect of destroying their natural character so as to render the lands fronting on them nonriparian. Logically, if this was so, the dam which plaintiffs have maintained for many years across the San Joaquin River would have the effect of destroying the riparian character of all the lands below. And finally upon this point it should be said the court's findings disclose that by these sloughs, superior in location to Fresno Slough and thus to the James land, large quantities of water for many years have been taken and devoted to beneficial purposes; some to irrigation and domestic use on lands unquestionably riparian; others for like uses on land nonriparian either to the river proper or the slough. But this last use, open,

notorious and in interference with the flow of the river waters to Fresno Slough and so to the James's land, has given to these appropriators a prescriptive right to continue this use. The finding of the court that these sloughs in their natural state took water from the San Joaquin River only during the time when the Kings River was flowing into the San Joaquin River through the Fresno Slough, does not militate against this, first, because the deepening and improvements of the sloughs whereby they took water at very much lower stages of the river were made more than ten years before the commencement of the action, and the use of the water under the changed conditions has ripened into a prescriptive right, and, second, because the finding itself is not supported by the evidence.

"Appellants were entitled to their costs in the trial court as of course against the Enterprise Canal and Land Company and the James Canal Company, since the action against them involves the title to real property. (Code Civ. Proc., sec. 1022, subd. 5.)"

Our final conclusions upon these opinions are as follows: The J. G. James Company is entitled to take from Fresno Slough its reasonable quantity of water for use upon its riparian land, except that such diversion and use must not interfere with the diversion by the San Joaquin and Kings River Canal and Irrigation Company, Incorporated, by means of its dam, headgates, and canals at and near the junction of the San Joaquin River and Fresno Slough, from said river, of a stream of water equivalent to a flow of 760 cubic feet per second for public use. The right of said San Joaquin and Kings River Canal and Irrigation Company, Incorporated, to take said quantity of water from said river and devote the same to public use is paramount to the riparian rights of the J. G. James Company as owners of lands riparian to Fresno Slough. The defendants are not entitled to divert water for said lands, or at all, through or by means of the Enterprise canal, or the James Company's canal, but may take the same only from Fresno Slough.

The findings are full and complete and, with the exceptions stated, are sustained by the evidence. Those which are not are, according to the views which we have expressed as to the law, unimportant and may be disregarded. Those remaining are sufficient to support a judgment in harmony with our

conclusions. We see no reason to believe that a retrial would or should produce essentially different findings of fact. A new trial is not necessary.

It is therefore ordered by the court that the order denying a new trial be affirmed, that the parts of the judgment appealed from be vacated and the cause remanded to the court below, which shall thereupon proceed to modify its judgment to make it conform to this opinion. Appellants to recover costs.

Melvin, J., Sloss, J., Lorigan, J., and Angellotti, C. J., concurred.

Rehearing denied.